1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Gila River Indian Community, a federally        Nos. CV-10-1993-PHX-DGC
    recognized Indian tribe; Delvin John Terry,          CV-10-2017-PHX-DGC
10  Celestino Rios, Brandon Rios, Damon Rios, and        CV-10-2138-PHX-DGC
    Cameron Rios, members of the Gila River Indian
11  Community; the City of Glendale and Michael
    Socaciu and Gary Hirsch, residents of Glendale;
12  Speaker of the House Kirk Adams, House           **ORDER**
    Majority Leader John McComish, House Majority
13  Whip Andy Tobin, and Senate Majority Leader
    Chuck Gray, in their official capacities as
14  members of the Arizona Legislature; and the State
    of Arizona,
15
                              Plaintiffs,
16
    vs.
17
18  United States of America; United States
    Department of the Interior; Kenneth L. Salazar, in
19  his official capacity as Secretary of the Interior;
    Larry Echo Hawk, in his official capacity as
20  Assistant Secretary for Indian Affairs; and Tohono
    O'odham Nation, a federally recognized Indian
21  tribe,

22                            Defendants.

23

24          This case concerns a July 23, 2010 decision by the United States Department of

25  the Interior to accept in trust for the benefit of the Tohono O'odham Nation a 54-acre

26  parcel of unincorporated land surrounded by the City of Glendale, Arizona.  The Nation

27  plans to build a Las Vegas style casino and resort on the property – plans that have

28  evoked  vigorous  opposition  by  Glendale,  Arizona  legislative  and  executive  branch

leaders, and another Indian tribe.  Plaintiffs ask the Court to set aside the Department's decision as invalid under statutes dealing with Indian lands and gaming, as well as the United States Constitution.

At the outset, it is important for the Court to note what is *not* at issue in this case. This case does not concern appropriate limits on Indian gaming.  This case is not about whether the federal government, as a matter of good governance, should show greater deference to the wishes of state and local voters and leaders.  This case is not about who promised what to whom when gaming laws and compacts were adopted in the past.  This case is not even about whether a Las Vegas style casino in the middle of Glendale is a good idea.  Federal district courts are not commissioned to roam broadly through the social landscape implementing their own views of good public policy.  The questions this Court must decide are narrow and legal: was the Department's decision to take the land into trust for the benefit of the Nation "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and did it violate the United States Constitution or the Indian Gaming Regulatory Act?

The parties have filed motions for summary judgment.  Docs. 84, 85, 86, 88, 95, 98.  The Court heard extensive oral arguments on February 17, 2011.  For reasons that follow, the Court concludes that Plaintiffs have provided no legal basis to set aside the Department of the Interior's decision.

## I.      Factual Background.

The O'odham Indians (formerly the Papago) lived for centuries along the banks of the Gila River in southwestern Arizona.  In 1882, the federal government established for the O'odham people a 22,000-acre reservation near Gila Bend, Arizona.  The reservation was reduced to roughly 10,000 acres in 1909.  H.R. Rep. 99-851, at 4 (1986).

In 1960, the federal government completed construction of Painted Rock Dam ten miles downstream from the Gila Bend reservation.  The dam was built to provide flood protection for the City of Yuma and others living south of the reservation.  The O'odham

1    were told that flooding from the dam would occur so infrequently as not to impair their
2    ability to farm the reservation land, but flooding on the reservation between 1978 and
3    1984 far exceeded the projections made when the dam was built.  Floodwaters destroyed
4    a large farm developed at tribal expense and effectively precluded all economic use of
5    reservation lands.  *Id.* at 4-6.

6         Congress responded in 1986 by enacting the Gila Bend Indian Reservation Lands
7    Replacement Act (the "Gila Bend Act" or the "Act"), Pub. L. No. 99-503, 100 Stat. 1798
8    (Oct. 20, 1986).  The purpose of the Act was to replace reservation land affected by the
9    Dam, and otherwise to "promote the economic self-sufficiency of the O'odham Indian
10   people."  *Id.* § 2(4).   Under the Act, the Tohono O'odham Nation (the "Nation")
11   transferred 9,880 acres within the Gila Bend reservation to the United States in return for
12   $30 million to purchase replacement land.  *Id.* §§ 4(a), 6(c).  Where certain requirements
13   were met, the Act required the Secretary of the Interior to take up to 9,880 acres of
14   purchased land into trust for the benefit of the Nation, a step that would effectively make
15   the purchased land part of the Nation's reservation.  *Id.* § 6(d).

16        In August 2003, the Nation purchased a 135-acre parcel of land near 91st and
17   Northern Avenues in Maricopa County.  AR4435, 4908-19.  The purchase was made
18   through a corporation wholly-owned by the Nation.  *Id.*  The land is part of an
19   unincorporated county island surrounded by the City of Glendale.

20        On January 28, 2009, the Nation announced plans to use the land for gaming
21   purposes and filed with the Department of the Interior ("DOI") an application to have the
22   land taken into trust under the Gila Bend Act.  AR4341-4907.  The Nation claimed that
23   the land would be taken into trust as part of "a settlement of a land claim" for purposes of
24   the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(B)(i), and therefore
25   would be excepted from IGRA's general prohibition against gaming on reservation lands
26   acquired after October 17, 1988.  AR4360-61, 4373-80.  Consistent with regulations
27   implementing IGRA, 25 C.F.R. §§ 292.3, 292.5, the Nation requested that DOI issue an
28   "Indians lands opinion" confirming that, once held in trust, the 135-acre parcel met the

requirements of IGRA's "settlement of a land claim" exception for gaming purposes. AR3589-90.

The Nation withdrew its request for an Indians lands opinion on July 17, 2009. AR2163-64.  On March 12, 2010, due to an ongoing state-court lawsuit over whether the City of Glendale previously had annexed a portion of the 135-acre parcel, the Nation requested that DOI accept only "Parcel 2" of the 135-acre tract in trust and hold the remainder of the application in abeyance pending resolution of the state-court case. AR758-62.  Parcel 2 consists of 54 acres on the westernmost part of the 135-acre tract.

DOI issued its decision on July 23, 2010, concluding that the legal requirements under the Gila Bend Act for taking Parcel 2 into trust had been satisfied.  AR3-10; *see* 75 Fed. Reg. 52550-01, 52550 (Aug. 26, 2010).   The decision will be referred to in the remainder of this order as "the Trust Decision."  Consistent with the Nation's withdrawal of its request for an Indian lands opinion, the Trust Decision did not determine the Nation's eligibility to game on Parcel 2 under IGRA.  *Id.*

Suits challenging the Trust Decision have been brought by the City of Glendale, the Gila River Indian Community (the "Community"), and individual members of the Community (the "Terry and Rios Plaintiffs").  The State of Arizona and members of the Arizona Legislature (the "Legislators") have intervened as Plaintiffs, and the Nation has intervened as a Defendant.  All Plaintiffs seek declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Docs. 57, 58, 74, 89, 121.  The claims challenge DOI's decision to take Parcel 2 into trust under Section 6 of the Gila Bend Act, and its failure to determine the Nation's eligibility to game on Parcel 2 under IGRA.  *Id.*  Glendale and the State assert that the Gila Bend Act, as applied, violates the Tenth Amendment and the Indian Commerce Clause of the United States Constitution. Docs. 57, 121.  The Legislators assert Tenth Amendment and IGRA claims.  Doc. 84.[1]

---

[1] Arizona Governor Janice K. Brewer has filed an *amicus curiae* brief concurring in the arguments made by the City of Glendale.  Doc. 91.  Defendants have filed responses to that brief. Docs. 100, 101.

## II.    Standing.

To sue in federal court, a plaintiff must have standing under Article III of the United States Constitution, that is, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).  The party invoking federal jurisdiction bears the burden of establishing the three elements of constitutional standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).

The United States argues in its summary judgment motion that only states have standing to bring a Tenth Amendment claim.  Doc. 95 at 21-37.  The Court has granted the State of Arizona's motion to intervene in this case.  Docs. 103, 120.  The Court therefore need not consider whether other plaintiffs have standing to assert a Tenth Amendment claim.  *See Leonard*, 12 F.3d at 888; *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).  Because the State has joined the briefs filed by Glendale and the Community (Doc. 103 at 5), the Court will consider the Tenth Amendment arguments made by those Plaintiffs as though made directly by the State.  *See Nat'l Ass'n of Optometrists*, 567 F.3d at 523 (referring to the appellees collectively where one had standing).

The United States further argues that no Plaintiff has standing to bring a claim under IGRA.  Doc. 95 at 20-21.  The Court does not agree.

Plaintiffs have presented evidence that they will suffer genuine injury as a result of gaming on Parcel 2.  Glendale will incur millions of dollars to provide necessary services, including fire and other public-safety services associated with a large casino operation, it will lose tax revenue from surrounding businesses that lose customers to the proposed casino, and its residents will suffer assorted quality-of-life injuries from gaming activities that will occur in the midst of their neighborhoods.  Docs. 110 at 9, 87 ¶¶ 62-69.  The

Community will also suffer genuine injury because a major casino in Glendale will reduce the Community's revenue from its own casinos, particularly the Vee Quiva Casino located less than 20 miles from Parcel 2.  Docs. 111 at 16, 111-1.  This, in turn, will harm the Terry and Rios Plaintiffs by reducing their per capita payments as members of the Community.  *Id.*; Docs. 107 at 5, 107-1 at 3-17.  Given the Nation's stated plan to move forward with its casino once Parcel 2 is held in trust, the threat of injury is real.  The injury requirement of standing is satisfied.

The causation requirement is not met, the United States argues, because the Trust Decision expressly withheld an IGRA determination.  Docs. 95 at 20, 117 at 5.  In support of this argument, the United States cites *Stop the Casino 101 Coalition v. Salazar*, No. C 08-02846 SI, 2009 WL 1066299 (N.D. Cal. Apr. 21, 2009), *aff'd* 384 Fed. Appx. 546 (9th Cir. June 3, 2010).  The district court in that case found that the plaintiffs' injuries from potential future gaming on trust land were too speculative to create standing.  2009 WL 1066299, at *3-4.  But the plaintiffs in *Stop the Casino 101*, unlike Plaintiffs in this case, did not assert that DOI's decision to hold land in trust violated IGRA.  2009 WL 1066299, at *4.

The United States conceded at the hearing that while an IGRA determination on Parcel 2 may one day be made by the National Indian Gaming Commission ("NIGC") – in connection with its approval of a site-specific ordinance, licenses to operate the casino, or potential management contracts – the Nation can start operating a casino on Parcel 2 without any IGRA determination having been made by DOI.  Doc. 128 at 42-44.  The Nation likewise asserted that it can start gaming on Parcel 2 without any Indian lands opinion under IGRA.  *Id.* at 53.  If the United States and the Nation are correct in their assertion that gaming may begin merely upon Parcel 2 being taken into trust – without any Indian lands opinion being rendered under IGRA – then DOI's decision to take the parcel into trust is a cause of the injuries Plaintiffs will suffer as a result of gaming at the site.  Stated differently, Defendants' own position that nothing more than the Trust Decision is needed for the Nation to start gaming on the site is sufficient to establish the

1   Trust Decision as a cause of the gaming that will injure Plaintiffs.  In *Stop the Casino*
2   *101*, by contrast, additional steps were required before gaming could begin at the site,
3   making the plaintiffs' alleged injuries speculative.  2009 WL 1066299, at *3-4 (noting
4   that the Tribe still had to negotiate a gaming compact with California).  Defendants in
5   this case take the position that no additional steps will be required before gaming can
6   begin.

7          The United States argues that the redressability requirement of standing is not met.
8   But if the Court rules in favor of Plaintiffs on the merits of their IGRA claim, that is, that
9   DOI should have made an IGRA determination as part of the Trust Decision, and if on
10  remand DOI addresses the issue and concludes that Parcel 2 does not qualify for gaming
11  under IGRA, then the Court's ruling would prevent the casino from being built and
12  thereby redress Plaintiffs' injuries.

13         The Court finds that Plaintiffs have standing to bring their IGRA claim and the
14  State has standing to bring a Tenth Amendment claim.  Defendants do not assert a lack of
15  standing with respect to the Gila Bend Act claims.

16  **III.    Standard and Scope of Review Under the APA.**

17         The Administrative Procedure Act ("APA") does not allow a court to overturn an
18  agency decision simply because the court disagrees with the decision.  *River Runners for*
19  *Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  A court may set aside the
20  agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise
21  not in accordance with law."  5 U.S.C. § 706(2)(A).  "This standard of review is highly
22  deferential, presuming the agency action to be valid and affirming the agency action if a
23  reasonable basis exists for its decision."  *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife*
24  *Serv*., 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).

25         In addition to these substantive limitations, review under the APA generally is
26  restricted to the administrative record.  *See* 5 U.S.C. 706(2); *Ariz. Cattle Growers' Ass'n*
27  *v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).  The Court must
28  consider only those materials that were presented to the agency before it made the

challenged decision.  *Id.*  The Court may consider materials outside of the administrative record only in limited circumstances, none of which exists in this case.  *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006). The Court's decision therefore is limited to the administrative record supplied by the parties.  *See* Docs. 42, 70.[2]

**IV.     The Gila Bend Act.**

The Trust Decision violates the APA, Plaintiffs argue, because (1) DOI failed to determine whether the 9,880-acre acquisition limitation found in § 6(c) of the Act already had been exceeded when the Nation acquired Parcel 2 in August of 2003, (2) Parcel 2 lies "within the corporate limits" of Glendale in violation of § 6(d), and (3) DOI failed to determine whether a water management plan can be developed for Parcel 2 in violation of § 6(e).  The Court will address each of these arguments in turn.

**A.     Waiver of the Section 6(c) Argument.**

Section 6(c) of the Gila Bend Act authorizes the Nation "to acquire by purchase private lands in an amount not to exceed, in the aggregate, [9,880] acres."  Pub. L. 99-503, 100 Stat. 1798.  Under § 6(d) of the Act, DOI is required, where certain conditions are met, to hold in trust land which the Nation acquires pursuant to § 6(c).  *Id.*  The Trust Decision concludes that "the legal requirements under the Gila Bend Act for acquiring Parcel 2 in trust have been satisfied" (AR10), but does not explicitly address § 6(c).

Relying on evidence outside the administrative record (*see* Doc. 87 ¶ 3), the Community argues that the Nation had exceeded the 9,880-acre limit in § 6(c) before purchasing Parcel 2, and a remand is therefore required to allow DOI to consider this extraneous evidence and make a § 6(c) determination (Doc. 88 at 12).  The § 6(c) argument has been waived, the Nation contends, because no party raised it during the administrative process.  Doc. 98 at 21.  The Nation is correct.

---

[2] Citations to the administrative record will be to the "AR" number at the bottom right corner of each page.  Citations to pages in the parties' briefs and other filings in the Court's electronic docket will be to page numbers applied to the top of each page by the electronic docket system, not to page numbers at the bottom of each page.

"A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemployment Compensation Comm'n of Territory of Alaska v. Aragon*, 329 U.S. 143, 155 (1946).  As the Supreme Court has recognized in more than a few decisions, "orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *United States v. L.A. Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952) (citations omitted); *see also Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007) (citing cases).  Indeed, "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administration not only has erred but has erred over objection[.]" *L.A. Truck Lines*, 344 U.S. at 37.

The Community concedes that it never argued during the administrative process that DOI was obligated to make a § 6(c) determination before taking Parcel 2 in trust.  Doc. 128 at 14.  That argument could not have been raised, the Community asserts, until it discovered documents purportedly showing that the Nation had exceeded the 9,880-acre cap prior to its purchase of Parcel 2.  Docs. 111 at 9, 128 at 14.  But, as the Nation and the United States correctly note (Docs. 94 at 4, 118 at 11), those documents are not relevant to the legal question of whether § 6(c) limits the total amount of land that may be purchased under the Act, or whether it limits only the total amount of land that may be taken into trust under the Act.

The Nation took the latter position before the agency, counting only trust land against the 9,880-acre cap.  AR4367.  The Community did not challenge this reading of § 6(c), nor did it object to the similar conclusion reached by DOI.  AR4307-08, 4317.

If the Community (or any other Plaintiff) believed, contrary to the positions taken by the Nation and DOI, that all lands purchased by the Nation count against the 9,880-

1  acre limit in § 6(c), it should have said so during the administrative proceedings.  It did

2  not.  Instead, it read § 6(c) the same way it was interpreted by the Nation and DOI,

3  stating in its submissions to DOI that "Section 6(c) limits the number of acres that may be

4  *placed in trust* to no more than 9,880 acres."  AR849 (emphasis added); *see* AR865-66.

5       The Community now argues that even if it has waived the § 6(c) argument, that

6  argument may be raised in this Court by the other Plaintiffs who did not participate in the

7  administrative process.  Docs. 111 at 8-9, 128 at 11.  But a party that did not participate

8  in the administrative process may challenge the agency's decision in court only on the

9  basis of "issues that were submitted by others during the administrative process." *Choate*

10  *v. U.S. Army Corps of Eng'rs*, No. 4:07-CV-01170-WRW, 2008 WL 4833113, at *5

11  (E.D. Ark. Nov. 5, 2008).  Stated differently, the waiver rule does not limit who may seek

12  judicial review of an agency's decision, but it does limit what can be raised in judicial

13  review.  *Choate*, 2008 WL 4833113, at *5; *see Portland Gen. Elec. Co. v. Bonneville*

14  *Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007) (issues not waived where other

15  parties repeatedly raised those arguments during the administrative process and the

16  agency defended the legality of its position); *see also Natural Res. Def. Council v. EPA*,

17  824 F.2d 1146, 1151 (D.C. Cir. 1987) (issue exhausted where it was explicitly raised by

18  other parties during the administrative process and the agency had considered and

19  resolved the issue); *S. Pac. Transp. Co. v. I.C.C.*, 69 F.3d 583, 588 (D.C. Cir. 1995 ("we

20  permit a party that is aggrieved to raise arguments it did not present to the agency but

21  were presented by other parties"); *Maine v. Shalala*, 81 F. Supp. 2d 91, 101 (D. Me.

22  1999) ("The fact that another entity had raised the issue below, and created an

23  administrative record[,] vitiates the concerns reflected in the . . . policies that underlie the

24  doctrine of procedural default.").

25       The Community concedes that no party raised § 6(c) during the administrative

26  process and that the administrative record as a whole includes no analysis of § 6(c).

27  Docs. 88 at 11-12, 102 at 4.  The argument has therefore been waived.  While there are

28  certain "exceptional circumstances under which a court might dispense with the raise-or-

waive rule in the administrative law context," *Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric.*, 984 F.2d 514, 524 (1st Cir. 1993), none is applicable in this case.  The § 6(c) argument therefore may not be considered by the Court.  *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004) (failure to raise an objection at the administrative level forfeits that objection for purposes of later litigation); *see also Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1298 (D.C. Cir. 2004) ("'respect for agencies' proper role in the *Chevron* framework requires that the court be particularly careful to ensure that challenges to an agency's interpretation of its governing statute are first raised in the administrative forum'") (citation omitted).

The Community's reliance on *Sims v. Apfel*, 530 U.S. 103 (2000), is misplaced.  Doc. 111 at 10.  *Sims* is a social security case, and "[t]he difference between courts and agencies are nowhere more pronounced that in Social Security proceedings."  530 U.S. at 110.  The Commissioner of Social Security has no representative before the ALJ to oppose the claim for benefits, and the ALJ therefore bears an independent duty to investigate the facts and develop the arguments both for and against granting benefits.  *Id.* at 110-11.  Social Security proceedings, therefore, are inquisitorial rather than adversarial.  *Id.*  Because the administrative proceedings before DOI in this case involved the adversarial development of issues by the parties, *Sims* does not save the waived § 6(c) argument.  *See Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006) (distinguishing *Sims* as recognizing only a narrow exception to issue exhaustion where the administrative proceeding was inquisitorial and non-adversarial); *see also* II Richard J. Pierce, Jr., *Administrative Law Treatise* 1284-85 (Wolters Kluwer, 5th ed. 2010) (discussing the limited import of *Sims*).[3]

### B.  Section 6(d) of the Act.

Parcel 2 is part of a "county island," that is, unincorporated land surrounded by the

---

[3] The Community's citation of *Jicarilla Apache Nation v. U.S. Dept. of Interior*, 613 F.3d 1112 (D.C. Cir. 2010), is also unpersuasive.  DOI forfeited its waiver argument in that case by failing to raise it in the district court, and the party alleged to have waived its argument before DOI was not permitted to participate directly in the DOI proceedings.  *Id.* at 1117-18.

1   municipality of Glendale.  *See Town of Gilbert v. Maricopa County*, 141 P.3d 416, 418
2   n.1 (Ariz. Ct. App. 2006) (describing a county island).  Land may be taken into trust
3   under § 6(d) of the Gila Bend Act only if it is not "within the corporate limits of any city
4   or town[.]"  Pub. L. 99-503, 100 Stat. 1798.  The Act nowhere defines this language.  The
5   legislative history provides little help, stating only that land may be taken into trust where
6   it is "outside the corporate limits of any city or town."  H.R. 99-851, at 11.

7       In the Trust Decision, DOI found the phrase "corporate limits" to have a plain
8   meaning:  "The use of 'corporate limits' shows a clear intent to make a given piece of
9   property eligible under the Act if it is on the unincorporated side of the city's boundary
10  line."  Doc. 1-1 at 7; AR3-10.  Glendale disagrees, asserting that the Act uses "corporate
11  limits" to mean the outer boundary of a city.  Doc. 86 at 13-14.  Thus, according to
12  Glendale, Parcel 2 is within the corporate limits of Glendale because it is entirely within
13  the exterior boundary of the City.  *Id.* at 16.

14      "In examining statutory terms, '[courts] should usually give words their plain,
15  natural, ordinary and commonly understood meanings.'"  *United States v. Gallenardo*,
16  579 F.3d at 1085-86 (9th Cir. 2009) (citation omitted).  Applying this canon of
17  construction, the Court finds the meaning of "within the corporate limits" to be
18  ambiguous.  It seems clear that "corporate limits" means incorporated land.  *See* Black's
19  Law Dictionary 947, 364, 947 (8th ed. 2004) ("corporate" means "[o]f or relating to a
20  corporation" and "limit" is a "restriction or restraint," a "boundary or defining line," and
21  the "extent of power, right, or authority"); *see also Transwestern Pipeline Co. v. 17.19*
22  *Acres of Prop. Located in Maricopa County*, 627 F.3d 1268, 1270 (9th Cir. 2010) (courts
23  should consult dictionary definitions when determining the meaning of statutory
24  language).  The key question, then, is the meaning of "within."  One reasonable
25  interpretation is that "within" means surrounded by, but not part of, incorporated land.
26  *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/within (last visited
27  Feb. 28, 2001) ("within" indicates "enclosure or containment").  For example, the
28  Kingdom of Lesotho is entirely "within" the Republic of South Africa, and yet not part of

1   South Africa.  Similarly, it reasonably can be said that Parcel 2 is "within" the corporate

2   limits of Glendale even though Parcel 2 is not part of Glendale.

3         While not controlling, this interpretation is supported by the Arizona Supreme

4   Court's decision in *Flagstaff Vending Co. v. City of Flagstaff*, 578 P.2d 985 (Ariz. 1978).

5   The majority in that case squarely held that because the City of Flagstaff surrounds

6   Northern Arizona University, the school is "within" the corporate limits of the City.  578

7   P.2d at 987.   DOI and the Nation distinguish *Flagstaff Vending* on the ground that

8   Northern Arizona University previously had been annexed by the City of Flagstaff, but

9   the case says nothing about that fact, and the concurring opinion suggests that it was not

10  known to the court.  578 P.2d at 561-62 (Cameron, CJ., concurring).

11        Nor is *Flagstaff Vending* limited by the holdings in *Speros v. Yu*, 83 P.3d 1094,

12  (Ariz. Ct. App. 2004), and *Sanderson Lincoln Mercury, Inc. v. Ford Motor Co.*, 68 P.3d

13  428 (Ariz. Ct. App. 2003).  *See* AR8 n.3.  Those cases stand only for the proposition that

14  it is possible for property, like Parcel 2, to be "within the exterior boundary of a city and

15  yet not be part of the city."  *Speros*, 83 P.3d at 1100; *see Sanderson*, 68 P.3d at 432 ("an

16  area excluded from the defined area of incorporation is not part of the 'city,' as is true of

17  a county island").   The question under § 6(d) is not whether Parcel 2 is part of the

18  incorporated land of Glendale – everyone agrees it is not – but whether Parcel 2 is

19  "within the corporate limits" of Glendale.  *Speros* and *Sanderson* shed no light on that

20  issue.

21        A second reasonable interpretation of § 6(d) is the one adopted by DOI – that

22  "within corporate limits" means within incorporated land.   *See* Merriam-Webster,

23  http://www.merriam-webster.com/dictionary/within (last visited Feb. 28, 2001) ("within"

24  can mean "an inner place or area").  This interpretation, like the one pressed by Glendale,

25  also is supported by Arizona law.  *See* A.R.S. § 9-461.11 (describing the extraterritorial

26  jurisdiction of a municipality over unincorporated territory which is "beyond the

27  corporate limits of the municipality").   The interpretation also is consistent with

28  Glendale's own conduct.  The procedures required to extend and increase the "corporate

limits" of a city or town by annexation are set forth in A.R.S. § 9-471.  Pursuant to that statute, Glendale adopted an ordinance in 1977 annexing a strip of land surrounding Parcel 2 and other unincorporated territory.  That ordinance makes clear that Glendale was extending and increasing its "corporate limits" only with respect to the strip of land that was actually annexed.   AR1532-39; *see also* AR1186-87 (2001 Ordinance); AR1198-99, 1208-09, 1218-19 (2002 Ordinances). Thus, consistent with Arizona law, Glendale's own conduct shows that a city's corporate limits are extended through annexation, and adjacent unincorporated county islands remain outside the city's corporate limits.  *See City of Safford v. Town of Thatcher*, 495 P.2d 150, 153 (Ariz. Ct. App. 1972) (noting that the legislative purpose of annexation is to extend a municipality's "corporate limits").

Glendale asserts that Congress enacted the Gila Bend Act with the intent that the Nation replace its previous 9,880 acres of rural reservation land with a similar cohesive reservation, and that the "within the corporate limits" language was designed to forbid the "geographically disparate, partially urban reservation the Secretary has now approved." Doc. 86 at 17-18.  The Nation notes, on the other hand, that the Act was intended to facilitate replacement of reservation lands with lands suitable for "sustained economic use which is not principally farming and do not require Federal outlays for construction[.]"  Pub. L. No. 99-503, § 2(4).  Congress made clear that the O'odham people were in need of a land base that can provide them "realistic and reasonable opportunities for economic and social development," and that "[s]ignificant opportunities for employment or economic development in the town of Gila Bend . . . simply do not exist."  H.R. 99-851, at 7.  Congress specifically intended that the Nation "have great flexibility in determining the use of funds provided under [the] Act."  *Id.* at 10.  The Nation's purchase of economically desirable land near urban areas is not inconsistent with the Act's purposes.

In addition to citing Arizona law and the legislative history of § 6(d), both sides cite statutes and court cases from outside Arizona to support their reading of "within

corporate limits." *See* Doc. 98 at 16-18; Doc. 110 at 19-20.  The Court finds Defendants' citations more compelling, but acknowledges that cases have accepted Plaintiffs' reading as well.  *Id.*

So what must the Court do when both sides advocate reasonable interpretations of § 6(d), only one of which was adopted by DOI?  The Court must defer to the agency's interpretation of the statute.   The question before the Court is not whether DOI's interpretation is correct, but whether it is "based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 2.  Indeed, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

This rule of deference – typically referred to as "*Chevron* deference" – is well established. *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1191 (9th Cir. 2000).  The Ninth Circuit recently stated that such deference applies "'when it appears that Congress delegated authority to the agency generally to make [decisions] carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Service*, 629 F.3d 1024, 1034 (9th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001)).

DOI administers the Gila Bend Act.  The Act explicitly provides that the Secretary of the Interior, *see* Pub. L. 99-503, § 3(3), "shall be required to carry out the obligations of [the] Act," *id.* § 9(a).  This includes holding land in trust where certain requirements are met.  *Id.* § 6(d).  The Secretary's determination regarding the meaning of "within corporate limits" was "intended to have the force of law, as it formed the basis for the Secretary's decision under the [Act] to acquire property in trust for the [Nation.]" *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 466-67 (D.C. Cir.

1    2007).  The Secretary published notice of the Trust Decision in the Federal Register.  75

2    Fed. Reg. 52550-01, 52550 (Aug. 26, 2010).  Because that publication "reflects a

3    deliberative agency's self-binding choice," it is "further evidence of a *Chevron*-worthy

4    interpretation."  *Citizens Exposing Truth*, 492 F.3d at 467.  As a result, DOI's

5    interpretation of § 6(d) is entitled to *Chevron* deference.  *See Ninilchik*, 227 F.3d at 1191

6    (citing cases granting *Chevron* deference to the Secretary's interpretation of statutes

7    administered by DOI); *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th

8    Cir. 2002) (*Chevron* deference due even though agency statements are not the result of

9    formal rulemaking or adjudication); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1293

10   (D.C. Cir. 2000) (applying *Chevron* deference to the Secretary's statutory interpretation

11   where the Secretary was authorized by statute to acquire land in trust for a tribe).[4]

12          Deference to DOI's interpretation of § 6(d) is also compelled by the well-settled

13   canon of construction that "statutes are to be construed liberally in favor of the Indians,

14   with ambiguous provisions interpreted to their benefit[.]"  *Montana v. Blackfeet Tribe of*

15   *Indians*, 471 U.S. 759, 766 (1985) (citations omitted).  Glendale asserts that this canon

16   does not apply where Indian tribes are on both sides of the dispute, but the Gila Bend Act

17   was enacted for the benefit of the Nation, not the Community or any other tribe.  The Act

18   therefore should be construed liberally in favor of the Nation.  *See EEOC v. Karuk Tribe*

19   *Hous. Auth.*, 260 F.3d 1071, 1081-82 (9th Cir. 2001) (applying the canon to adopt an

20   interpretation generally favoring Indian interests even though Indians were on both sides

21   of the case); *Doe v. Mann*, 415 F.3d 1038, 1047 (9th Cir. 2005) (same).

22          The City, citing *Peter Pan Bus Lines, Inc. v. Federal Motor Carrier Safety*

23   *Admin.*, 471 F.3d 1350 (D.C. Cir. 2006), argued at the hearing that if the Court finds the

24   language of § 6(d) to be ambiguous, then DOI's decision finding the meaning of § 6(d) to

25   be plain constitutes error under the APA.  Doc. 128 at 21-22.  This is the law, according

26   _____

27          [4] Even if DOI's issuance of the Trust Decision could not be viewed as a sufficient
     exercise of delegated authority to warrant *Chevron* deference, it would be entitled to *Skidmore*
     deference as the informed judgment of the agency tasked with administering the Gila Bend Act.
28   *See Wilderness Watch*, 629 F.3d at 1034-35.

1    to the City, because an agency's finding that a statute is plain shows that the agency did
2    not engage in the "reasoned grappling" necessary to interpret an ambiguous statute. *Id.* at
3    23.  But in an opinion dated April 3, 2009, the Phoenix Field Solicitor explicitly found
4    the "within corporate limits" language to be ambiguous, concluding after extensive
5    analysis of Arizona law and the purpose of the Gila Bend Act that the language should be
6    construed to mean that Parcel 2 does not fall within the corporate limits of Glendale.
7    AR4311-17.  DOI's final decision explicitly acknowledged the Field Solicitor's opinion.
8    AR7-8.  While DOI ultimately found the meaning of § 6(d) to be plain, the efforts of the
9    Field Solicitor show that the agency did not fail to grapple with the meaning of the
10   provision, nor to provide a reasoned explanation for its decision.

11           In summary, the Court concludes that DOI's decision to acquire Parcel 2 in trust
12   under § 6(d) of the Gila Bend Act was based on a permissible construction of the statute.
13   The Court must defer to that construction.

14       **C.    Section 6(e) of the Act.**

15           The Community notes that § 6(e) of the Gila Bend Act requires the Secretary "to
16   establish a water management plan for any land *which is held in trust*[.]"  Pub. L. No. 99-
17   503, § 6(e) (emphasis added).  But the Community is wrong in asserting that this must be
18   done before Parcel 2 can be taken into trust.  Doc. 88 at 13.  The Community cites no
19   legal authority establishing such a requirement, and the Court agrees with Defendants
20   that the plain language of § 6(e) does not require the Secretary to establish a water
21   management plan before taking land in trust.

22       **D.    Gila Bend Act Summary.**

23           The argument that DOI erred by failing to conduct an accounting under § 6(c) of
24   the Act has been waived and may not be considered by the Court.  The "within corporate
25   limits" language of § 6(d) is ambiguous, but DOI's interpretation of that language is
26   reasonable and therefore must be upheld.  Finally, DOI had no obligation under § 6(e) to
27   establish a water management plan before deciding to hold Parcel 2 in trust.  Because the
28   Court cannot conclude that the Trust Decision was "arbitrary, capricious, an abuse of

1    discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), summary

2    judgment must be granted in favor of Defendants on the Gila Bend Act claims.

3    **V.    IGRA.**

4           The Trust Decision "does not address or determine the Nation's eligibility to game

5    on Parcel 2 under IGRA."  Doc. 1-1 at 9; AR10.  The Community contends that DOI's

6    decision to accept Parcel 2 in trust is arbitrary and capricious, and therefore in violation

7    of the APA, because a gaming decision under IGRA must be made before land is taken

8    into trust.  Doc. 88 at 14.  The Court does not agree.

9           The Trust Decision takes Parcel 2 into trust under the Gila Bend Act.  IGRA

10   expressly states it does not "affect or diminish the authority and responsibility of the

11   Secretary to take land into trust."  25 U.S.C. § 2719(c).  Thus, IGRA clearly does not

12   limit DOI's authority to take Parcel 2 into trust under the Act.  The Community does not

13   argue otherwise.   Indeed, the Community itself admitted during the administrative

14   proceedings that "the gaming eligibility determination [under IGRA] *cannot* be a basis

15   for denying a Gila Bend Act trust application[.]"   AR110 (emphasis added); *see also*

16   AR75 (same).

17          The Community now contends that DOI's regulations and policies require that a

18   gaming decision be made before land is taken into trust under the Gila Bend Act.   In

19   support, the Community cites 25 C.F.R. § 292.3, a June 18, 2010 memorandum from the

20   Secretary to the Assistant Secretary for Indian Affairs addressing decisions on Indian

21   gaming applications (Doc. 87-7 at 15-17), a September 2007 gaming acquisition checklist

22   issued by the Assistant Secretary for Indian Affairs to regional directors (Doc. 87-8), and

23   a memorandum of agreement ("MOA") between DOI and the NIGC (Docs. 87-7 at 2-5,

24   7-9, 11-13).

25          The regulation, 25 C.F.R. § 292.3, explains how a tribe may seek an Indian lands

26   opinion.  Subsection (b) provides that "[i]f the tribe seeks to game on newly acquired

27   lands that require a land-into-trust application or the request concerns whether a specific

28   area of land is a 'reservation,' the tribe must submit a request for an opinion to the Office

of Indian Gaming."  While the regulation could be read as requiring that a tribe request an opinion whenever land is to be taken into trust for purposes of gaming, DOI does not interpret it that way.  DOI reads the word "must" in § 292.3(b) as requiring that the tribe request the opinion from DOI's Office of Indian Gaming, rather than from NIGC.  In other words, the regulation specifies from whom an opinion must be sought, not when it must be sought.  The Court finds this interpretation plausible.

When two plausible interpretations of an agency regulation exist, a court must accept the agency's preferred interpretation.  As the Supreme Court has explained, an agency's interpretation of its own regulation is controlling unless plainly erroneous or inconsistent with the regulation.  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007); *Auer v. Robbins*, 519 U.S. 452, 462 (1997).  The Court cannot conclude that DOI's interpretation of § 292.3(b) is either plainly erroneous or internally inconsistent, and must therefore defer to DOI.  This is true even when, as here, the interpretation is provided for the first time in litigation.  *See Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 220 n.7 (D.C. Cir. 2007) (citing *Long Island*, 551 U.S. at 171).

The June 18 memorandum provides, in relevant part, that "[u]nder IGRA's implementing regulations, [DOI] has the responsibility to determine whether gaming can occur on lands acquired after IGRA's enactment in 1988."  *Id.* at 15.  But contrary to the Community's assertion (Doc. 88 at 15), nothing in the June 18 memorandum, as a matter of department policy or otherwise, requires DOI to make a gaming decision under IGRA before taking land into trust.

The September 2007 checklist provides that "[a]ll applications for the trust acquisition of land intended for gaming must be processed with [IGRA] considerations in mind" (*id.* at 10), and where the application indicates that the proposed acquisition falls within one of the exceptions for land acquired after 1988, "[a] legal opinion from the Office of the Solicitor concluding that the proposed acquisition comes within one of [those] exceptions must be included" (*id.* at 11).  The MOA provides that whether a tribe meets one of the IGRA exceptions "is a decision made by the Secretary when he or she

1    decides to take land into trust for gaming."  Doc. 87-7 at 2.

2          The checklist and MOA, according to the Community, reflect DOI policy in favor

3    of determining whether a proposed acquisition falls within one of IGRA's exceptions

4    before land is held in trust.  But even if this is true, the checklist and MOA are internal

5    agency documents that give no rights to Plaintiffs.  Those documents do not prescribe

6    substantive rules.  At most, they constitute "'interpretive rules, general statements of

7    policy or rules of agency organization, procedure or practice[.]'"  *United States v. Fifty-*

8    *Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (1982) (citation omitted).  Nor were

9    they promulgated in conformance with the procedures of the APA, or published in the

10   Code of Federal Regulations.  *See id.*  As a result, these documents lack the force of law

11   and cannot be relied on by Plaintiffs in this action.  *See River Runners*, 593 F.3d at 1071-

12   73.

13         Moreover, DOI found the Parcel 2 trust acquisition to be "mandatory" because the

14   Gila Bend Act states that the Secretary "shall" hold land in trust, not "may" hold land in

15   trust, when certain requirements are met.  Doc. 1-1 at 5; AR6; Pub. L. 99-503, § 6(d).  A

16   gaming determination under IGRA is not one of the specified requirements in the Act.

17   *Id.*  Thus, the Act mandated that DOI take the land into trust regardless of whether a

18   gaming determination had been made.  IGRA is not to the contrary.  Indeed, IGRA

19   specifically states that nothing in its provisions "shall affect or diminish the authority and

20   responsibility of the Secretary to take land into trust."  25 U.S.C. § 2719(c).

21         The result is that DOI, under the specific command of Congress in the Gila Bend

22   Act, was required to take Parcel 2 into trust when the requirements of the Act were met.

23   The Community does not challenge, under the APA or otherwise, DOI's conclusion that

24   the Parcel 2 trust acquisition is mandatory.  *See Sault Ste. Marie Tribe of Lake Superior*

25   *Chippewa Indians v. United States*, 78 F. Supp. 2d 699, 702-05 (W.D. Mich. 1999)

26   (upholding Secretary's determination that trust acquisition was mandatory as "eminently

27   reasonable" and "not arbitrary or capricious"); *see also Wyandotte Nation v. NIGC*, 437

28   F. Supp. 2d 1193, 1211 (D. Kan. 2006) (same).  Thus, DOI's failure to make an Indian

1    gaming determination provides no basis for setting aside the Trust Decision.

2          The Arizona Legislators assert that the Nation's compact with Arizona, A.R.S.

3    § 5-601.02, expressly incorporates provisions of IGRA (Doc. 84 at 13), and that because

4    DOI has violated IGRA by accepting Parcel 2 into trust without issuing an Indian lands

5    opinion (*id.* at 13-17), DOI simultaneously violated the compact between the State and

6    the Nation (*id.* at 17).  As explained more fully above, however, DOI has not violated

7    IGRA.  Moreover, DOI is not a party to the compact between the State and the Nation.

8    Doc. 95 at 21 n.6; *see* A.R.S. § 5-601.02.  The Legislators do not explain how the

9    compact can require DOI – a nonparty to the compact – to issue an Indian lands opinion.

10          It may well be preferable as a matter of public policy to have gaming decisions

11   under IGRA made when land is taken into trust.  But the question before the Court is not

12   good policy, and not even whether IGRA is "ideally suited to resolving, in a timely

13   fashion, the Indian lands status for proposed tribal casinos."  *N. County Cmty. Alliance,*

14   *Inc. v. Salazar*, 573 F.3d 738, 748 (9th Cir. 2009).  The question, rather, is whether IGRA

15   and its implementing regulations required DOI to make an Indians land determination

16   when it chose to take Parcel 2 into trust.  For the reasons stated above, IGRA imposed no

17   such obligation.  The Court accordingly concludes that the Trust Decision was not

18   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and

19   will grant summary judgment in Defendants' favor on the IGRA claims and the

20   Legislators' related claim under the state-tribal compact.

21   **VI.     The Tenth Amendment and the Indian Commerce Clause.**

22          Glendale contends that the Trust Decision encroaches on state sovereignty in

23   violation of the Tenth Amendment and exceeds Congress's power under the Indian

24   Commerce Clause.  Doc. 86 at 24-31.  As counsel for Glendale agreed during oral

25   argument, Plaintiffs ask the Court to break new ground on this issue – to depart from

26   every court decision that has previously addressed it.  The Court declines the invitation.

27          The Tenth Amendment provides that the "powers not delegated to the United

28   States by the Constitution . . . are reserved to the States[.]"  U.S. Const. amend. X.  Of

particular relevancy in this case is the fact that the Constitution does delegate broad power to the United States to regulate Indian affairs.  Article I empowers Congress "[t]o regulate Commerce . . . with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  "It is well-settled that this power affords plenary legislative authority in Indian affairs."  *Cent. N.Y. Fair Bus. Ass'n v. Salazar*, No. 608-CV-600, 2010 WL 786526, at *4 (N.D.N.Y. Mar. 1, 2010) (citing cases).  In passing the Gila Bend Act, Congress expressly stated that it was fulfilling "its responsibility to exercise plenary power over Indian affairs to find alternative land for the O'odham people."  H.R. Rep. 99-851, at 7 (1986).

Glendale argues that a court may not ignore the Tenth Amendment and look only to Article I to decide if congressional action is authorized.  Doc. 86 at 28.  But where "a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States[.]"  *New York v. United States*, 505 U.S. 144, 156 (1992).  The Indian Commerce Clause delegates power to Congress, and this Clause "has received an expansive interpretation by the Supreme Court."  *Cent. N.Y. Fair Bus. Ass'n*, 2010 WL 786526, at *4; *see Morton v. Mancari*, 417 U.S. 535, 551 (1974) (noting the "plenary power of Congress to deal with the special problems of Indians"); *Cotton v. Petro. Corp.*, 490 U.S. 163, 192 (1989) ("the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs"); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights"); *United States v. Lara*, 541 U.S. 193, 200 (2004) ("the Constitution grants Congress broad powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive'").  Indeed, "[w]ith the adoption of the Constitution, Indian relations became the exclusive province of federal law."  *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 234 (1985).

As other courts have recognized, DOI's decision to take land into trust for the benefit of Indian tribes "must be read as a valid exercise of the power delegated to Congress by the Constitution."  *New York v. Salazar*, No. 6:08-CV-644 (LEK/GJD),

2009 WL 3165591, at *6 (N.D.N.Y. Sept. 29, 2009).  And because DOI's "authority to take land into trust for Indians springs from powers delegated to Congress in Article I, [the Gila Bend Act] as applied herein does not implicate the Tenth Amendment." *Id.*; *see Cent. N.Y. Fair Bus. Ass'n*, 2010 WL 786526, at *3-4; *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 153-54 (D.D.C. 2002); *Carcieri v. Kempthorne*, 497 F.3d 15, 20, 39-40 (1st Cir. 2007) (the Secretary may take land into trust "without consent of the State" and without offending the Tenth Amendment because "Congress has plenary authority to regulate Indian affairs"), *rev'd on other grounds by Carcieri v. Salazar*, 129 S. Ct. 1058 (2009).

Glendale contends that *Carcieri* and like cases err in ignoring the state sovereignty inquiry altogether.  Doc. 86 at 28-29.  But the Tenth Amendment provides courts "no license to employee freestanding conceptions of state sovereignty when measuring congressional authority" expressly granted under the Indian Commerce Clause.  *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985).

Glendale further contends that the Indian Commerce Clause does not authorize the acquisition of Parcel 2 in trust under the Gila Bend Act because the proposed acquisition does not "regulate commerce" with Indian tribes.  Doc. 86 at 30.  But Congress enacted the Gila Bend Act to provide the Nation replacement lands "suitable for sustained economic use" and to "promote the economic self-sufficiency of the O'odham Indian people."  Pub. L. 99-503, § 2(4).  Consistent with those stated goals, the Nation intends to conduct commercial activities on Parcel 2.  The Court cannot conclude that the Gila Bend Act, as applied in this case, lies outside the scope of the Indian Commerce Clause.

Because Plaintiffs have failed to show that the Trust Decision exceeds the power granted Congress under the Indian Commerce Clause or otherwise violates the Tenth Amendment, the Court will enter summary judgment in favor of Defendants on these claims.

**VII.   Conclusion.**

Applying the deference required under the APA and other well established

principles of law, the Court concludes that the Trust Decision does not violate the APA or run afoul of the Tenth Amendment, the Indian Commerce Clause, or IGRA.  The Court therefore has no legal basis for setting aside the Trust Decision.

**IT IS ORDERED:**

1.     Plaintiffs' motions for summary judgment (Docs. 84, 85, 86, 88) are **denied**.

2.     Defendants' cross-motions for summary judgment (Docs. 95, 98) are **granted**.

3.     The United States' motion to strike exhibit 3(a) to Plaintiffs' unified statement of facts (Doc. 94) is **denied** as moot.

Dated this 3rd day of March, 2011.


_____
David G. Campbell
United States District Judge